# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **ARTRA 524(g) ASBESTOS TRUST,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 09 C 458** |
| | ) | |
| **v.** | ) | **Judge Sharon Johnson Coleman** |
| | ) | **Magistrate Judge Geraldine Soat Brown** |
| **TRANSPORT INSURANCE CO., as** | ) | |
| **successor to TRANSPORT** | ) | |
| **INDEMNITY CO.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Geraldine Soat Brown, United States Magistrate Judge

Before the court are two motions to compel discovery: Defendant Transport Insurance Company's Motion to Compel Plaintiff and Frank/Gecker LLP to Produce Documents (Def.'s Mot.) and Plaintiff ARTRA 524(g) Asbestos Trust's Motion to Compel Production of Reinsurance Documents and Communications (Pl.'s Mot.). For the reasons stated below, defendant's motion to compel is granted, and plaintiff's motion to compel is granted in part and denied in part.[1]

---

[1] Transport's motion and the parties' subsequent related submissions are cited as: Transport's Insurance Company's Motion to Compel Plaintiff and Frank/Gecker to Produce Documents: "Def.'s Mot." [dkt 100], and its supporting memorandum: "Def.'s Mem." [dkt 105]; the Trust's Memorandum in Opposition to Transport Insurance Company's Motion to Compel and in Support of Plaintiff's Cross-Motion for a Protective Order: "Pl.'s Opp'n" [dkt 112.]; Transport's

# BACKGROUND

ARTRA 524(g) Asbestos Trust ("the Trust") brought this action against Transport Insurance Company ("Transport") for a declaratory judgment and damages under Illinois law for breach of an insurance policy issued by Transport's predecessor in interest.[2] Transport issued a policy of excess comprehensive general liability insurance coverage to ARTRA Group, Inc. ("ARTRA Group") for the policy year April 1, 1984 - April 1, 1985. (First Am. Compl. ¶¶ 1, 15, 17.) [Dkt 37.] On June 3, 2002, ARTRA Group filed for bankruptcy protection from mounting liabilities it faced resulting from its ownership of the Synkoloid Company, a company that manufactured, sold and distributed products containing asbestos. (First Am. Compl. ¶¶ 10, 11, 22; *see also* Voluntary Pet., *In re ARTRA Group, Inc.*) [Bankr. N.D. Ill., No. 02 B 21522, dkt 1.] As described below, the Trust was established by ARTRA Group's Joint Reorganization Plan to liquidate and resolve all of ARTRA Group's asbestos-related personal injury liabilities. (Ans. ¶ 23.) [Dkt. 38.]

In this lawsuit, the Trust seeks to reach Transport's excess policy in order to pay claims for asbestos-related injuries; Transport denies liability. In the present motions, both sides seek documents the other claims are privileged or protected. In order to resolve the motions, it is

---

Reply: "Def.'s Reply" [dkt 115]; Frank/Gecker LLP's Supplemental Memorandum in Opposition: "F/G Suppl. Mem." [dkt 127]; and Transport's Response to Frank/Gecker LLP's Supplemental Memorandum: "Def.'s Suppl. Resp." [dkt 132]. The Trust's motion and the parties' subsequent related submissions are cited as: Plaintiff ARTRA 524(g) Asbestos Trust's Motion to Compel Production of Reinsurance Documents and Communications: "Pl.'s Mot." [dkt 106]; Transport's Memorandum in Opposition: "Def.'s Opp'n" [dkt 111]; the Trust's Reply: "Pl.'s Reply" [dkt 116]; Transport's Supplemental Memorandum in Opposition: "Def.'s Suppl. Mem." [dkt 124]; and the Trust's Supplemental Memorandum in Support of Plaintiff's Motion to Compel: "Pl.'s Suppl. Reply" [dkt 133].

[2] Because Transport has assumed that predecessor's liabilities (Ans. ¶ 17 [dkt 38]), this opinion will simply refer to "Transport."

necessary to understand the background of the Trust.

A.      Creation of the ARTRA 524(g) Asbestos Trust

In June 2002, the United States Trustee appointed a creditors committee (the "Creditors Committee"), consisting of ARTRA Group's largest unsecured creditors and certain attorneys for holders of asbestos-related personal injury claims.  (Pl.'s Opp'n, Unlabeled Ex., Aff. of Joseph D. Frank ¶ 4.)  [Dkt 112-3.]  The Creditors Committee retained Joseph Frank and Frances Gecker (first of Freeborn & Peters, later Neal Gerber & Eisenberg, then Frank/Gecker ("F/G")) as its attorneys. (*Id.*)  The Creditors Committee also hired Legal Analysis Systems ("LAS"), a claims forecaster, to provide expert assistance.  (*Id.* ¶ 5.)  The Creditors Committee negotiated the terms of an Amended Joint Reorganization Plan ("the Plan") with ARTRA Group and with the Future Claimants' Representative (former Bankruptcy Judge Erwin Katz (ret.)) who had been appointed by the Bankruptcy Court to represent the interests of future asbestos claimants.  (*Id.*)

On January 24, 2007, ARTRA Group filed the Plan, which was confirmed by the Bankruptcy Court and by the District Court.  (*Id.* ¶ 2.)[3]  The Plan became effective on April 2, 2007.  (*Id.* ¶ 2.)

B.      The Trust procedures

The Plan included the formation of the Trust pursuant to Section 524(g) of the Bankruptcy Code (11 U.S.C. § 524(g)).  (Plan § 6.6.)  The purpose of the Trust is "to assume liability for all Asbestos Personal Injury Claims . . . and to use the Asbestos Trust Assets to pay holders of Allowed

_____

[3] Neither party provided the court with a copy of the Plan, but it is available on the docket of the Bankruptcy Court.  [Bankr. N.D. Ill. No. 02 B 21522, dkt 1187, 1196.]

Asbestos Personal Injury Claims in accordance with the Asbestos Trust Agreement and the Trust Distribution Procedures." (Plan § 6.6(a); *see also* 11 U.S.C. § 524(g)(2)(B)(i)(I-IV).) The Trust is required to implement certain procedures to resolve and pay claims such that it "will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(2)(B)(ii)(V).

The Trust is the successor to certain assets and liabilities of ARTRA Group. (Ans. ¶ 23; Plan § 6.6.) The Honorable Alfred Wolin (ret.) serves as the trustee. (J. Frank Aff. ¶ 2.) Allowance of a claim by the trustee establishes the Trust's liability for that claim. (Ans. ¶ 26.) Notably, Transport has denied that the allowance of any claim by the trustee operates to establish liability under the Transport policy. (*Id.*)

The Trust evaluates and pays claims pursuant to the Trust Distribution Procedures ("TDPs"), including Scheduled Values and Average Values for certain claims, which are incorporated into the Plan. (Def.'s Mot., Unlabeled Ex., Aff. Kevin A. Titus, Ex. N.) [Dkt 101.] The TDPs, which are publically available, define the criteria for determining whether an asbestos bodily injury claim is compensable, and specify the Scheduled Values of amounts to be paid for claims reviewed under the Trust's expedited review procedure. (*Id.* §§ 5-7.) The TDPs provide for both an expedited review pursuant to the schedules and an Individual Review Process that allows for more intensive individualized claim evaluation. (*Id.* § 5.3(a), (b).) According to Transport, the overwhelming majority of claims submitted to the Trust seek expedited review under the TDPs. (Def.'s Mem. at 11.)

The TDPs were the product of negotiations between the Creditors Committee (then represented by F/G) and the Future Claimants' Representative regarding the Plan and the Trust

Agreement. Among the documents Transport seeks in its motion are communications between F/G and the Creditors Committee about those negotiations.

The Creditors Committee dissolved in April 2007, when the Plan became effective. (Plan § 15.3.) The Trustee then retained F/G to represent the Trust, and Verus Claims Services, LLC, ("Verus") to process claims. (J. Frank Aff. ¶ 2.) According to the Trust, as of July 2009, the Trust had allowed 5,934 claims, and had paid over $464,000,000 in claims and pre-petition settlements. (First Am. Compl. ¶28.)

C.    The Transport policy

The Transport policy is a part of an excess layer of ARTRA Group's insurance coverage. (Ans. ¶¶ 15, 17.) In pertinent part, the Transport policy provides indemnification for "ultimate net loss" following "the insuring agreements, conditions and exclusions of the underlying insurance (whether primary or excess) immediately preceding the layer of coverage provided by" the Transport policy. (*Id.*; First Am. Compl., Ex. C ¶¶ 1, 2.) According to the Trust, as of September 2009, only about $2,451,000 of the policy limits of the lower ("umbrella") layer of insurance coverage remained unexhausted, and the total allowed claims had already exhausted the underlying layer of insurance. (First Am. Compl. ¶ 14.)

The Trust alleges that it has made several demands to Transport for payments of the allowed claims, but Transport has refused or reserves its right to refuse to pay. (*Id.* ¶¶ 29-30.) Transport disputes that it owes any coverage under the policy for the Trust's liabilities. (Ans. ¶ 33.) It alleges a number of affirmative defenses, including that the Trust is not an insured and has no rights under the Transport policy. (Ans., Sixth Aff. Defense.) Transport also alleges that some or all of the

claims or damages are not covered by the policy because they do not fall within the terms of the policy coverage (for example, the claims do not constitute an "occurrence" or are not based on "bodily injury" as defined in the policy). (Ans., Seventh, Eighth, Ninth, Eleventh Aff. Defenses.)

### D. The present motions

Both parties served discovery requests upon each other. In addition, Transport sought documents in connection with depositions and served a subpoena on F/G, which has asserted privilege and work product objections. (Titus Aff., Exs. E, G, H.) The parties submitted their withheld documents for *in camera* review. During the course of briefing and court hearings on the motions, the parties narrowed the disputes. The number of contested documents has been significantly reduced.[4] The motions are addressed below in turn.

## DISCUSSION

## I. Transport's Motion to Compel

Transport seeks to compel the Trust and F/G to produce documents related to the following:

(1) the handling, adjustment, processing and payment of asbestos bodily injury claims;

(2) the Trust's evaluation and payment of pre-petition settlements of asbestos bodily injury claims; and

---

[4] For example, part of Transport's motion sought documents relating to the Individualized Review Process for the payment of claims submitted for such review. Transport particularly wanted the Individualized Review Valuation Methodology Memorandum, which Transport's counsel had previously been permitted to see and to question deponents about but not to keep. (Def.'s Mem. at 5.) After a hearing, the parties reached an agreement, and the documents have been produced. (*See* dkt 134, 135.) Both that portion of Transport's motion and the Trust's cross-motion for a protective order (included in the body of its opposition to Transport's motion) are, therefore, moot.

(3) the drafting and determination of the TDPs, including the Expedited Review Schedule and Average Values.

(Def.'s Mot. ¶ 5; Def.'s Mem. at 2-3.)

It is important to note that Transport does not seek documents relating to the Trust's litigation of this lawsuit. (Def.'s Reply at 8.) Rather, it seeks documents relating to the claims for asbestos-related damages that the Trust alleges Transport must pay under the policy.

The Trust does not argue that the documents Transport seeks are not relevant. Rather, the objections before the court are that the documents are protected by attorney-client privilege or work-product protection, and that there is no common interest between the Trust and Transport. (Pl.'s Opp'n at 4, 10.) The Trust asserts such protection for documents dated after the creation of the Trust in April 2007. It also argues for protection for communications between the Creditors Committee and its then-counsel F/G and the consultant LAS that pre-date the formation of the Trust, and that deal with the negotiation of the terms of the Plan, including the TDPs. (Id. at 6-8.)[5]

Transport argues that documents that belong to the Trust or F/G are either not protected by

---

[5] The identity of specific documents at issue in Transport's motion has been something of a moving target. Initially, Transport provided spreadsheets of the documents it sought. (Titus Aff., Ex. A .) The Trust and F/G responded with their own two spreadsheets, apparently dividing the documents into whether the privilege or protection was claimed by the Trust (Pl.'s Opp'n, Ex B) or on behalf of the Creditors Committee (id., Ex. A). After the court ordered the disputed documents to be provided for in camera inspection, F/G tendered a packet of documents and advised the court that all other requested documents would be produced to Transport. (Dkt 139.) That turned out to be not quite correct.

A minute order was issued identifying the documents listed on Transport's spreadsheet but not appearing on the Trust and F/G's spreadsheets and not delivered for in camera inspection. (Dkt 136.) Transport was given leave to confirm whether those documents were still at issue in its pending motion to compel. (Id.) Transport's subsequent submission noted that ten documents the Trust and F/G had suggested had been produced remained in dispute. (Dkt 137.) Those ten documents were thus ordered to be provided for in camera inspection. (Dkt 138.) The documents were duly delivered for inspection. (Dkt 140.)

the attorney-client privilege or work-product doctrine or have been put at issue by the Trust's indemnification claims. (Def.'s Mem. at 7-9, 11-14; Def.'s Reply at 7-11.) It further argues that any claim of privilege relating to communications with the Creditors Committee can no longer be sustained since that Committee no longer exists. (Def.'s Reply at 4-5.)

At a hearing on the motion, the court raised the question of who can assert privilege on behalf of the now-dissolved Creditors Committee. F/G was given leave to file a supplemental memorandum in opposition to Transport's motion on that issue. (Order, Apr. 12, 2011.) [Dkt 121.] That memorandum does not answer the question directly, but it appears that F/G is asserting privilege on behalf of its former client, the Creditors Committee. F/G maintains that communications between it, the Creditors Committee and LAS remain protected because the Committee members expected their communications to remain confidential beyond the lifetime of the Committee and because the Creditors Committee itself has not put them at issue in this case. (F/G Suppl. Mem. at 5-10.) In support, F/G submitted identical affidavits from attorneys who had been members of the Creditors Committee regarding communications with F/G and LAS. (*Id.*, Exs. A-F.) Each of the affiants states that he or she "rel[ied] upon the understanding that these communications were, and would remain confidential communications covered by the attorney-client privilege." (*Id.* ¶ 6.)

A.   Claims handling and evaluation documents, and pre-petition settlement documents

The claims handling and evaluation documents reflect communications among the Trustee, the Trust's counsel (F/G), and employees of Verus pertaining to the processing and valuation of asbestos claims made against the Trust. (Def.'s Mem. at 7-9; Titus Aff., Ex. A at 1-17.) They

discuss, for example, whether a particular Synkoloid product contained asbestos (FGA 1631); or whether a particular claimant's claim might be barred by the state statute of limitations (FGA 1632-35). The "pre-petition settlement" category consists of documents that reflect communications among those same persons relating to F/G's and Verus's analysis of settlements reached between ARTRA Group and various asbestos claimants before ARTRA Group filed its petition for bankruptcy, and a discussion of processes for handling such settlements. (Def.'s Mem. at 14-15; Titus Aff., Ex. A at 20-23).

### 1. *The Trust's assertion of attorney-client privilege*

Relying on the Illinois Supreme Court's holding in *Waste Mgt., Inc. v. Int'l Surplus Lines Ins. Co.*, 579 N.E.2d 322 (Ill. 1991), Transport argues that the attorney-client privilege and work-product protection do not prevent Transport from discovering all of the Trust's documents on those subjects, both because of the common interest shared between an insurer and its insured and because of the cooperation clause in the Transport policy. (Def.'s Mem. at 7-8, 14-15.) By bringing this coverage action, Transport argues, the Trust has put information regarding its claims evaluation and payment process at issue in the case. (*Id.* at 9, 14-15.)

Because Illinois state law supplies the rule of decision here, Illinois law applies to the analysis of attorney-client privilege. *See* Fed. R. Evid. 501. In *Waste Management,* the Illinois Supreme Court held that, in a coverage action, the attorney-client privilege and work-product protection do not bar discovery of the insured's counsel's underlying litigation files. *Waste Mgt.,* 579 N.E.2d at 327. The court started its analysis by observing that, under Illinois law, "it is the privilege, not the duty to disclose, that is the exception. . . . [I]n Illinois, we adhere to a strong policy

of encouraging disclosure, with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit." *Id.* (citations omitted). Although the court found the underlying litigation files relevant and at issue in the subsequent coverage litigation, its holding focused on the cooperation clause of the policy at issue and the common interest among the insurer and the insured. *Id.* at 327-28. "Any condition in the policy requiring cooperation on the part of the insured is one of great importance. . . . The basic purpose of a cooperation clause is to protect the *insurer's interests* and to prevent collusion between the insured and the injured party." *Id.* at 327 (citations omitted, emphasis in original). The cooperation clause in *Waste Management* required the insureds to "give all such information and assistance as the insurers shall reasonably require." *Id.* at 327-28. As a result, the court said, the insureds could not withhold communications with defense counsel representing them on a claim that the insurer had the ultimate duty to satisfy. *Id.* at 328. That duty to cooperate continues for as long as insureds seek to enforce the terms of the policy. *Id.*

The principle announced in *Waste Management* is not, as the Trust characterizes it, a "limited waiver" of attorney-client privilege (Pl.'s Opp'n at 10); rather, the court found the attorney-client privilege had "no application" in that context. *Waste Mgt.*, 579 N.E.2d at 327.

The Transport policy contains a broad duty of assistance and cooperation, consistent with Transport's position as an excess, not primary, carrier. It provides, in relevant part:

> The Insured shall immediately advise the Company [Transport] of any accident or occurrence which appears likely to result in liability under this Policy and of subsequent developments likely to affect the Company's liability hereunder. . . . [T]he Company shall have the right and shall be given the opportunity to associate with the Insured or its underlying insurer or insurers, or both, in the control, defense and/or trial of any claims, suit or proceedings which, in the opinion of the Company, involves or appears reasonably likely to involve the Company. If the company avails itself of such right and opportunity, the Insured, any underlying insurer or insurers and the Company shall cooperate in the control, defense and/or trial of such claims, suits or proceedings, so as to affect a final determination thereof. Failure on the part

of the Insured or the underlying insurer or insurers to cooperate shall relieve the Company, at its option, of liability under this Policy.

. . . . .

The Insured shall use due diligence and prudence to settle all such claims and suits which in the exercise of sound judgment should be settled, provided, however, that *the Insured shall not make or agree to any settlement for any sum, in excess of the underlying insurance, without the approval of the Company.*

(First Am. Compl., Ex. C. ¶¶ 8, 9, emphasis added.)  Notably, the Trust's complaint alleges that it has allowed claims, including pre-petition settlements, that have exhausted the underlying insurance, which why the Trust is reaching to the excess insurance (including Transport), and that the Trust must also anticipate future claims.  (First Am. Compl. ¶¶ 28, 35.)

The above-quoted clauses in the Transport policy trigger a cooperation obligation that has the same consequence as the clause in the *Waste Management* decision.  "Even were the express words 'duty to cooperate' omitted from the contract, such a duty could reasonably be inferred based merely on principles of fairness and good faith."  *Waste Mgt.,* 579 N.E.2d at 332 (*suppl. op. on denial of reh'g*).  Illinois law, therefore, directs that there is no attorney-client privilege for the Trust to assert against Transport for communications relating to the underlying claims.[6]

The Trust argues three reasons why *Waste Management* should not apply.  First, it argues that the Trust is not bound by the cooperation clause in the Transport policy because the Trust was not the original contracting party and was not the one who agreed to the cooperation clause.  (Pl.'s Opp'n at 11.)  The Trust's only claim to coverage under the Transport policy, however, is by virtue

---

[6] That result is consistent with a conclusion reached by a district court in a similar situation without referring to the *Waste Management* decision. *UNR Indus., Inc. v. Contl. Ins. Co.*, No. 85 C 3532, 1992 WL 51708 at *4 (N.D. Ill. March 6, 1992) (applying duty of cooperation to asbestos trust to compel trust's production of claims analysis to excess insurer).

of its appointment as successor to ARTRA Group's insurance coverage. (First Am. Compl. ¶ 24; Plan § 6.6.) If it is a successor to ARTRA Group's rights under the policy, it succeeds also to ARTRA Group's obligations under that policy.

Second, the Trust argues that Transport is "estopped" from invoking the cooperation clause because it has denied liability under the policy. (Pl.'s Opp'n at 10.) The Trust does not cite any authority to support that argument, and it is contrary to both the letter and spirit of the *Waste Management* decision. In *Waste Management*, both parties had filed declaratory judgments seeking a declaration of rights under the policy at issue, and the insurer denied coverage in its answer to the insured's complaint, as Transport has here. *Waste Mgt.,* 579 N.E.2d at 325. The insured's cooperation obligation, the Illinois Supreme Court stated, continues for as long as the insured is asking the insurers "to perform their end of the bargain" (*i.e.,* pay the claims). *Id.* at 328. "The fact that the parties are now adverse concerning the interpretation of such [policy] terms does not negate [the] insured's contractual duty." *Id.* Here, the obligation to provide information arises from the fact that the Trust (which holds itself in the place of the insured) seeks to enforce the terms of the policy to make Transport pay the claims that the Trust has assumed pursuant to the Plan.

Third, the Trust argues that its nature as a 524(g) trust means that it does not have a "common interest" with Transport, unlike the insured and the insurer in *Waste Management*, who had a common interest in defeating or settling the claim against the insured. (Pl.'s Opp'n at 10-11.) The court in that case concluded that communications between the insured with its defense counsel were "of a kind reasonably calculated to protect or to further those common interests." *Waste Mgt.,* 579 N.E.2d at 328. Here, the Trust argues, its fundamental mission is to be sure that it is in a "financial position to pay, present claims and future demands that involve similar claims in

substantially the same manner," and not to defend claims. Thus, it argues, its counsel does not act for the mutual benefit of both the insured and the insurer. (Pl.'s Opp'n at 11-12, quoting 11 U.S.C. § 524(g)(2)(B)(ii)(V).)

The Trust acknowledges, however, that it is charged with resolving and paying only "*valid*" asbestos claims. (Pl.'s Opp'n at 12 (emphasis added).) As Transport notes, that the Trust acts for the benefit of valid claim holders means that it does not act for the benefit of holders of invalid claims. (Def.'s Reply at 10.) In fact, the Trust Agreement provides:

> The Asbestos Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding Asbestos Personal Injury Claims that [ARTRA] or any successor of [ARTRA] have or would have had under applicable law or under any agreement related thereto.

(Titus Aff., Ex. L., Trust Agreement § 1.4(b).) The TDPs establish procedures to defend and arbitrate claims brought against the Trust, as well as processes for expedited and individual claims analysis. (*See, e.g.,* Titus Aff., Ex. N § 7.5.) The Transport policy anticipates that the insured will settle claims "which in the exercise of sound judgment should be settled," provided, however, that the insured not settle in excess of the underlying insurance without Transport's approval. (First Am. Compl., Ex. C. ¶ 9.) Indeed, the Trust's interest is arguably closer to the insurer's than an insured's customarily is, because the Trust must take care not to dissipate its financial resources on questionable claims so that it will be in a position to pay both present and future valid claims.

The Trust is not materially different from the insured in *Waste Management*. It cannot assert an attorney-client privilege over communications regarding the handling and settlement of underlying claims against an insurer that it alleges must pay those claims.

2.      *The Trust's and its counsel's assertion of work-product protection*

The Trust also asserts that the work-product protection protects three documents, FGA 1416,

FGA 1449-52 and FGA 1476-79.  (Pl.'s Opp'n, Ex. B.)  Unlike the attorney-client privilege, the

claim of work-product protection is governed by federal law.  *See* Fed. R. Civ. P. 26(b)(3).  The

doctrine protects "documents and tangible things that are prepared in anticipation of litigation or for

trial by or for another party or its representative (including the other party's attorney, consultant,

surety, indemnitor, insurer, or agent)."  Fed. R. Civ. P. 26(b)(3)(A).  At its core, the work-product

doctrine shelters the mental processes of an attorney, providing a privileged area in which the

attorney can analyze and prepare a client's case.  *U.S. v. Nobles*, 422 U.S. 225, 238 (1975).  The

doctrine exists to "shield[] materials that are prepared in anticipation of litigation from the opposing

party. . . ."  *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 767-68 (7th Cir. 2006).


Courts have concluded that an insured or its counsel cannot assert work-product protection

for materials prepared for the underlying litigation when they are sought by an insurer called upon

to indemnify for the underlying claim.

> When work product is prepared for litigation in which multiple parties have an
> interest, such as an insurance company and its insured or an indemnitor and
> indemnitee pursuant to contract, the work product is not protected from discovery
> in a subsequent adversary proceeding between the parties that, at the time of the
> underlying litigation, had a common interest. Since the work-product protected
> documents were prepared for each party to the common interest, how could one
> preclude the other from access thereto?

Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine*, vol. 2, 1023 (5th

ed., ABA 2007) (citing cases including *Abbott Labs. v. Alpha Therapeutic Corp.*, 200 F.R.D. 401,

410 (N.D. Ill. 2001)).

Of course, work product prepared by the Trust's counsel for this litigation against Transport is not covered by a common interest with Transport, but Transport is not seeking any such materials. The documents as to which the Trust and its counsel assert work-product protection do not deal with this litigation. Rather, they deal with the Trust's handling of settled claims, and settlement is a matter covered by the cooperation clause of the Transport policy.

Therefore, the Trust's objections to producing documents relating to claims handling and evaluation and to pre-petition settlements are overruled.[7]

B.        Documents related to the drafting and determination of the TDPs

The disputed documents in this category are communications made during the pendency of the bankruptcy proceeding and prior to the effective date of the Trust relating to the formulation and negotiation of the TDPs and scheduled values of payments to claimants. (Def.'s Mem. at 5; Titus Aff., Ex. A at 9-19.; Pl.'s Opp'n, Ex. A.) In response to the subpoena served by Transport, F/G asserted attorney- client privilege over communications with the Creditors Committee (its former client) and LAS (the claims forecaster retained by the Committee), and also asserted common interest protection for communications among the Creditors Committee, F/G, ARTRA Group and the Future Claimants' Representative. (Titus Aff., Ex. H ¶¶ 6-8, Ex. I.) It appears that F/G has now produced documents reflecting communications that included representatives of ARTRA Group.[8]

_____

[7] This includes documents like FGA 144 and FGA 1495, which are emails about pre-petition settlements that were not listed on the Trust's logs, but were listed on Transport's log and included in the supplemental documents provided for *in camera* review pursuant to the court's September 7, 2011 order.

[8] Obviously, any communications with ARTRA Group about the underlying claims cannot be withheld from ARTRA Group's insurer. Any such documents that F/G has not produced to

The remaining issue is whether the attorney-client privilege can be asserted on behalf of the dissolved Creditors Committee, and if so, whether that privilege protects the documents from production here. Again, the application of attorney-client privilege is determined by Illinois law, which holds that "it is the privilege, not the duty to disclose, that is the exception." *Waste Management,* 579 N.E.2d at 327.

A creditors committee has the statutory authority to retain counsel and other professionals to assist it with its work. *See* 11 U.S.C. §§ 328, 1103. The attorney-client privilege has been recognized for communications between a creditors committee and its counsel during litigation with an adversary of the creditors committee and during negotiation of a reorganization plan. *See, e.g., In re Subpoenas Duces Tecum,* 978 F.2d 1159 (9th Cir. 1992); *In re Refco, Inc*., 336 B.R. 187, 197 (Bankr. S.D.N.Y. 2006) (collecting authorities).

Here, however, the Creditors Committee no longer exists. A threshold question is: who now is the holder of the attorney-client privilege as to the Creditors Committee's communications with its counsel, for purposes of asserting that privilege or waiving it? It is not F/G because the privilege belongs to the client, not the attorney. *In re Marriage of Decker*, 606 N.E.2d 1094, 1101 (Ill. 1992); *Hayes v. Burlington N. & Sante Fe Ry. Co.*, 752 N.E.2d 470, 474 (Ill. App. 1st Dist. 2001). The Trust is not claiming that it holds the Creditors Committee's privilege. On the contrary, it vigorously argues the converse: that its actions in this lawsuit cannot waive the privilege held by the Creditors Committee because the Trust is a different entity that reflects the interests of both the pre-petition creditors and the future asbestos claimants. (Pl.'s Opp'n at 7-8.) Further, it argues, because the Committee no longer exists, even the participation of former Creditors Committee members on

Transport must be produced.

the current Trust Advisory Committee cannot waive the privilege that belonged to the Creditors Committee. (*Id.*) If the Trust disclaims the authority to waive the privilege, it cannot claim the authority to assert it. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348-49 (1985) (noting that if an agent has authority to assert a corporation's attorney-client privilege the agent also has authority to waive it).

Although there are few decisions on point, Transport's argument that the privilege died with the Creditors Committee has some support. A bankruptcy court in this district concluded that a creditors committee's attorney-client privilege ceases to exist upon confirmation of the plan when the committee ceases to exist. *In re JMP Newcor Intl., Inc.*, 204 B.R. 963, 964 (Bankr. N.D. Ill. 1997) (holding that privilege no longer exists but attorney opinion work product of creditors' committee counsel may be protected). On the other hand, another bankruptcy court permitted a litigation trust formed pursuant to a reorganization plan to assert attorney-client privilege regarding a report that had been prepared for the creditors committee when the committee was investigating possible preference and fraudulent conveyance claims. *In re Hardwood P-G, Inc*., 403 B.R. 445 (Bankr. W.D. Tex. 2009). In that case, however, the terms of the plan expressly provided that "the Litigation Trust shall be deemed to be a successor-in-interest to the Committee . . . ." *Id.* at 451. Here, F/G and the Trust have not pointed to any such term in the Plan, and, as noted above, the Trust disclaims control over the Committee's privilege. Also, the *Hardwood* case involved a very different situation: the adversary seeking the report was not an insurer of the debtor trying to find out information about the valuation of the claims it is asked to pay; rather, the party seeking production was apparently one of the subjects of the report.

Another decision holding that the attorney-client privilege survived the dissolution of a

creditors committee was based solely on analogy to an Ohio statute providing that the privilege survives the dissolution of a corporation. *Off. Comm. of Admin. Claimants v. Bricker*, No. 05 C 2158, 2011 WL 1770113 (N.D. Ohio May 9, 2011). Again, F/G and the Trust have not argued that there is any comparable Illinois statute. Indeed, as F/G acknowledges, authorities hold that, generally, the attorney-client privilege does not survive the demise of a corporation.[9]

F/G has submitted affidavits from former members of the Creditors Committee expressing their hope and expectation that their confidential communications with F/G and LAS would remain privileged. (F/G Suppl. Mem., Exs. A-F.) But although an inanimate entity (like a corporation or the Creditors Committee) speaks through its agents, the attorney-client privilege belongs to the entity, not the individual who made the communication. The expectation of an individual officer that the communications would remain privileged is not controlling. *See Weintraub*, 471 U.S. at 348.

F/G has failed to establish that, in this case, the attorney-client privilege that belonged to the Creditors Committee survived the dissolution of that Committee.[10]

Additionally, the Trust, which is the co-creation of the Creditors Committee and is the mechanism by which the asbestos creditors' claims are paid, has put the TDPs at issue in this case.

---

[9] *See* F/G Suppl. Mem. at 4 (citing *Edgewater Med. Ctr. v. Rogan*, No. 04 C 3579, 2010 WL 2711448 at *5 (N.D. Ill. July 6, 2010) (noting in dicta that attorney-client privilege does not survive death of corporation); *TAS Distribg. Co. v. Cummins, Inc.,* No. 07-1141, 2009 WL 3255297 at *1-2 (C.D. Ill. Oct. 7, 2009) (collecting cases holding attorney-client privilege does not survive dissolution of corporation); *Gilliland v. Geramita*, No. 05 C 1059, 2006 WL 2642525 at *3 (W.D. PA Sept. 14, 2006) (finding that non-operating defunct corporation had no current management personnel with authority to assert attorney-client privilege of corporation).

[10] This is not a ruling that the privilege can never survive the dissolution of a creditors committee. Rather, under the facts presented to this court, F/G has failed to carry its burden of showing that the privilege survived.

The TDPs set out the procedures for processing claims for damages from asbestos exposure, and for the claimants that chose expedited review, the Scheduled Values that are to be paid for certain types of claims. For example, "Lung Cancer (Level V)" has a scheduled value of $40,000. (*See* Titus Aff., Ex. N at 21-24.) The Trust seeks a judgment that Transport must pay claims that have been allowed pursuant to the TDP procedures in the amounts set out in the Scheduled Values established by the TDPs. In fact, the Trust moved for partial summary judgment on its claim that Transport is required by Seventh Circuit precedent to pay the full value of allowed claims, *i.e.*, the values set forth in the TDPs. (Pl.'s Mem. Mot. Partial Summ. J. (citing *UNR Indus., Inc. v. Contl. Cas. Co.*, 942 F.2d 1101 (7th Cir. 1991)). [Dkt 65-1.][11]

The claims allowed pursuant to the TDPs exceed the underlying insurance, notwithstanding the fact that the Transport policy gives Transport the right to approve any settlement in excess of the underlying insurance. Transport has a right to discover how the Scheduled Values that it is being asked to pay were negotiated and determined, including to what extent they are or are not consistent with the limitations of the Transport policy.

Accordingly, F/G's objection to producing documents relating to the negotiation or formulation of the TDPs on the basis of the Creditors Committee's attorney-client privilege is overruled.[12]

---

[11] Transport disputes that the Trust is entitled to partial summary judgment. (Def.'s Opp'n Pl.'s Mot. Partial Summ. J. at 1 (citing Plan ¶ 6.13).) [Dkt 77.] No decision has yet been issued by the District Judge on that motion.

[12] A handful of documents are communications from members of the Creditors Committee to F/G after the confirmation of the Plan. These documents relate to pre-petition claims and settlements and must also be produced.

C.    The assertion of common interest privilege

Citing a "common interest" privilege, the Trust and F/G have resisted production of some communications among the Trust or the Creditors Committee or F/G with the Future Claimants' Representative on the subjects of claims handling, pre-petition settlements or the TDPs.   For example, FGA 1400 is an email from Dan Relles of LAS to Lawrence Levine (the Future Claimants' Representative's expert) dated December 11, 2004, attaching a handout with calculations and charts on tort liability estimates.  F/G apparently claims "Common-interest communications regarding TDP values" as the reason for the privilege.  (Titus Aff., Ex. A at 18.)

The "common interest" in this context does not of itself create a protection; it extends an existing privilege to allow protected communications to be shared with a third party who shares a common interest.  "The common interest privilege is not an independent basis for privilege but an exception to the general rule that no attorney-client privilege attaches when confidential communications are communicated in the presence of or to third parties. . . .  As such, the common interest privilege assumes the existence of a valid underlying privilege."  Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine*, vol. 1, 274 (5th ed., ABA 2007). Because there is no underlying privilege to prevent production of those documents to Transport, the fact that a document on those subjects was also shared with the Future Claimants' Representative does not create a privilege.  Accordingly, document FGA 1400 and its attachment (which is not Bates labeled) must be produced, as must any other documents on those subjects for which the same "common interest" privilege is asserted.

II.    **The Trust's motion to compel**

A.    Background

In its motion, the Trust seeks to compel Transport to produce a number of documents relating to reinsurance of the Transport policy. (Pl.'s Mot. at 1.) Transport obtained insurance from one or more reinsurers to cover some of its liability under the Transport policy. According to Brian LaJoie, Assistant Vice President of Claims for Transport, Transport's reinsurers are ultimately liable for a portion of any liability payments made under the Transport policy. (Def.'s Opp'n, Ex. 1, Aff. Brian LaJoie ¶¶ 1, 3.) [Dkt 111-1.][13]

In 1997, Transport retained the law firm Lord Bissell & Brook ("LBB") to provide legal advice and representation to Transport regarding coverage issues related to ARTRA Group's (and later, the Trust's) claims for coverage for asbestos claims under the Transport policy. (LaJoie Aff. ¶ 4.) After ARTRA Group filed for bankruptcy in 2002 and through the filing of this lawsuit, LBB provided legal advice and representation in connection with the issue of coverage, including settlement negotiations with counsel for the ARTRA Group's creditors and later the Trust.[14] (*Id.* ¶¶ 5-7.) LBB also represented Transport in lawsuit filed by Muralo Company, Inc., against ARTRA Group and its insurers, including Transport. (*Id.* ¶ 5.)

After filing the present lawsuit, the Trust served broad discovery requests asking Transport

---

[13]   Mr. LaJoie also submitted a supplemental affidavit. [Dkt 125.]

[14]   On July 17, 2003, attorney A. Kelly Turner of LBB entered an appearance in ARTRA Group's bankruptcy proceeding on behalf of Great American Insurance Company, "as managing agent on behalf of Transport Indemnity Company with respect to certain claims made under an excess liability policy issued to [ARTRA Group]." (Turner Appear., *In re ARTRA Group, Inc.*) [Bankr. N.D. Ill., No. 02 B 21522, dkt 452.] As discussed above, Transport has assumed the liabilities for the policy issued by Transport Indemnity Company.

to produce, *inter alia,* all documents and communications related to all reinsurance agreements, and all communications with reinsurers regarding ARTRA, the Trust, and insurance coverage for asbestos claims against ARTRA or the Trust. (Pl.'s Mot., Ex. A, Doc. Requests ¶¶ 7, 9.) The Trust does not attempt to argue that it is an insured under Transport's reinsurance agreements. Under Illinois law, a reinsurance agreement is distinct from and unconnected with the original insurance policy; the original policy holder is not a party to the reinsurance agreement. *In re Liquidations of Reserve Ins. Co*, 524 N.E.2d 538, 540-41 (Ill. 1988). Rather, the Trust argues that it is entitled to communications between Transport and its reinsurers under the general rules applicable to discovery between adversaries, because, it argues, the information is relevant and not privileged.

Transport claims attorney-client privilege and work-product protection for its communications with its reinsurers. (LaJoie Aff. ¶ 3.) It also argues that information about reinsurance is not relevant to any disputed issue in this lawsuit. (Def.'s Opp'n at 2-7.) Transport submitted the disputed documents for *in camera* inspection.[15] As with Transport's motion, the parties have narrowed the disputes somewhat.[16]

B.  Relevance

The Trust argues that discovery regarding reinsurance is relevant because it would shed light on Transport's view of certain issues in the case, aid in policy interpretation, and possibly contain

---

[15] The disputed documents are described in Mr. LaJoie's affidavits and on Transport's privilege logs. (LaJoie Aff.; Suppl. LaJoie Aff.; Suppl. Aff. Kevin Titus, Ex.1 [dkt 126].)

[16] For example, the Trust no longer seeks the actual reinsurance policies, and has agreed to allow information about the establishment or amount of reserves to be redacted. (Pl.'s Suppl. Reply at 7-8.)

admissions.    (Pl.'s Mot. at 3-6.)    Transport responds that reinsurance information and communications are irrelevant and will not illuminate any contract interpretation issue or affirmative defense in the case.  (Def.'s Opp'n at 2-7.)

There is an important difference between Transport's motion (discussed in the first part of this opinion) and the Trust's motion.  Transport seeks information about the handling of asbestos injury claims brought against its insured for which Transport is asked to pay; it does not seek communications revealing the Trust's counsel's (that is, F/G's) view of the Trust's claims against Transport in this lawsuit.  The Trust's motion, in contrast, seeks Transport's communications with its reinsurers specifically for the purpose of learning Transport's "admissions regarding the matter in dispute" in this lawsuit.  (Pl.'s Reply at 1.)  The Trust wants "Transport's admissions as to the meaning of the policy," *i.e.,* the subject of some of Transport's affirmative defenses in this lawsuit. (*Id*. at 2.)

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. " Fed. R. Civ. P. 26(b)(1).  "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*  The standard set out in the present Rule 26 is different from the standard in Rule 26 as it existed when the Supreme Court decided *Herbert v. Lando*, 441 U.S. 153 (1979), a case cited by the Trust.  (Pl.'s Mot. at 4.)  The version of Rule 26 in effect in 1979 set out a broader scope in which discovery about the "subject matter" of the complaint was allowed.  In 2000, Rule 26 was narrowed to its present formulation: "relevant to any party's claim or defense."  Under current Rule 26, discovery about the subject matter involved in the action but not relevant to an existing claim or defense can only be taken upon order of the court for good cause shown.  No such order has been

entered in this case.

Some of the cases the parties discuss regarding the discoverability of reinsurance information pre-date that change in Rule 26, and must be viewed with that change in mind. *See, e.g., Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 152 F.R.D. 132, 139-140 (N.D. Ill. 1993) (deciding relevance of reinsurance communications on basis of former version of Rule 26(b)(2)). But under either version of Rule 26, the Trust's requests for all documents and communications related to Transport's reinsurance agreements is too broad. *See Great Lakes Dredge and Dock Co. v. Com. Union Assurance Co.*, 159 F.R.D. 502, 504 (N.D. Ill. 1995) (holding that a request for "all documents" relating to reinsurance is too attenuated to a policy interpretation dispute to be discoverable); *see also U.S. Fire. Ins. Co. v. Bunge N. Am., Inc.*, 244 F.R.D. 638, 642-43 (D. Kan. 2007) (noting conflicting authorities and concluding that discoverability of communications with reinsurers should decided on case-by-case basis considering particular claims and defenses at issue).[17]

As noted above, Transport has withheld a relatively small number of documents, which the court has reviewed *in camera* in light of the issues in this case. For some of the documents, relevance is not the deciding issue because they do, in fact, involve information relevant to the claims and defenses in this case. Rather, the issue is whether they are protected by attorney-client privilege or work-product protection.

---

[17] Thus, the Trust's Interrogatory 8, requesting that Transport "[i]dentify each person with knowledge of Your Reinsurance Agreements, and Describe each Person's knowledge and the basis for such knowledge" (Pl.'s Mot., Ex. A), goes beyond what is relevant to the issues in this dispute between Transport and the Trust. To the extent the Trust is still seeking to compel any further information responsive to Interrogatory 8, the motion is denied.

C. <u>Attorney-client privilege and work-product protection</u>

Transport argues that, even if the documents it has withheld are relevant, they are protected by attorney-client privilege or work-product protection, or both. It also argues that any protected communications or documents shared with its reinsurers remain protected because of the common interest between Transport and its reinsurers. (Def.'s Opp'n at 8-11.) The Trust argues that the withheld documents are no more than routine communications in the business of insurance, and that the involvement of an attorney in their preparation does not, of itself, shield a business communication. (Pl.'s Mot. at 7-9.) The Trust has not, of course, seen the documents, so its characterization of the documents is based on Transport's descriptions in its privilege logs and inferences it draws from those descriptions.

As discussed above in connection with Transport's motion, the claim of attorney-client privilege in this action is determined with reference to Illinois state law, while the work-product protection is determined by federal law, particularly Federal Rule of Civil Procedure 26(b)(3).

In Illinois, "(1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection may be waived." *In re Himmel*, 533 N.E.2d 790, 794 (Ill. 1988) (internal quotations omitted). As noted earlier, in Illinois, "it is the privilege, and not the duty to disclose, that is the exception." *Waste Mgt.,* 579 N.E.2d at 327.

"The work-product doctrine protects documents prepared by attorneys in anticipation of litigation for the purpose of analyzing and preparing a client's case." *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010). Work product may be discoverable where the moving

party demonstrates a substantial need, but the court must protect an attorney's "mental impressions, conclusions, opinions, or legal theories," commonly referred to as opinion work product. Fed. R. Civ. P. 26(b)(3)(A), (B). The burden is on the party claiming work-product protection to show that the document was created in anticipation of litigation. *See Logan v. Com. Union Ins. Co.*, 96 F.3d 971, 976-77 (7th Cir. 1996)*; Binks Mfg. Co. v. Natl. Presto. Indus., Inc*., 709 F.2d 1109, 1119 (7th Cir. 1983). In determining whether the protection applies, courts look to whether "in light of the factual context 'the document can fairly be said to have been prepared or obtained *because* of the prospect of litigation.'" *Id.* (quoting *Binks Mfg.,* 709 F.2d at 1119) (emphasis in original). Documents that do not contain or refer to work product prepared by an attorney or other agent of a party to aid in pending or anticipated litigation, and which were generated in the ordinary course of business, are discoverable. *Allendale*, 152 F.R.D. at 136.

The basic principles are straightforward. Routine business communications are not protected, even if an attorney was involved in their preparation.

> The public policy issue behind this result is that insurance companies, which are in the business of reviewing, processing and adjusting claims, should not be permitted to insulate the factual findings of its claims investigation by the involvement of an attorney to perform such work. Therefore, the factual results of such an investigation are discoverable in cases challenging the denial of the claim, to the same extent as if such factual investigation was conducted by its own adjusters or claims department.

*Chi. Meat Processors, Inc. v. Mid-Century Ins. Co.*, No. 95 C 4277, 1996 WL 172148 at * 3 (N.D. Ill. Apr. 10, 1996). On the other hand, confidential communications for the purpose of legal advice and documents created in anticipation of litigation are protected. The question is: on which side of that line does each disputed document fall, in light of the factual background presented to the court? "It is often difficult to determine with precision when a particular attorney's work is 'in anticipation

of litigation' rather than 'an investigative report developed in the ordinary course of business.'" *Binks Mfg.*, 709 F.2d at 1120. That is particularly so in the insurance context because "[i]t is the very nature of an insurer's business to investigate and evaluate the claims of its insured, and the fact that the investigation and evaluation continues after litigation commences is not conclusive proof that material has been created to aid in that litigation." *Allendale*, 152 F.R.D. at 136 (internal citation omitted).

If one of the disputed documents at issue here is determined to be privileged or protected, the fact that the work product or legal advice was shared with Transport's reinsurer does not constitute a waiver of the privilege or protection, because of the common interest between Transport and its reinsurer regarding ARTRA Group's and the Trust's claims. *See Waste Mgt.*, 579 N.E.2d at 328 (recognizing the insured and insurer's common interest either in defeating or settling a claim waged against the insured); *see also U.S. v. BDO Seidman, LLP*, 492 F.3d 806, 815-16 (7th Cir. 2007) (analyzing common interest extension of attorney-client privilege); *Beneficial Franchise Co. v. Bank One, N.A.*, 205 F.R.D. 212, 216 (N.D. Ill. 2001) (applying common interest extension to work-product analysis); *Minn. Sch. Bds. Assn. v. Employers Ins. Co. of Wausau*, 183 F.R.D. 627, 631-32 (N.D. Ill. 1999) (same). Although the Trust argues that the nature of a reinsurance contract precludes application of the common interest extension, the shared interests of the reinsurer and insurer are not so materially different from the shared interests of a direct insurer and its insured as to conclude that the common interest does not apply. Likewise, the common interest doctrine protects against a waiver resulting from an insurer's disclosure of work-product protected information to its reinsurers; disclosure to a reinsurer does not increase the risk of disclosure to the

insurer's adversary.  *Minn. Sch. Bds.*, 183 F.R.D. at 631.[18]

### D.      The disputed documents

The Trust correctly observes that the burden is on Transport to show that each of the disputed documents deserves protection.  (Pl.'s Suppl. Reply at 2.)  To make that showing, Transport submitted the two affidavits by Mr. LaJoie discussed above, which describe Transport's retention of LBB as early as 1997 regarding the coverage issues about the Transport policy.  The Trust has not disputed any of the facts in Mr. LaJoie's affidavits.  The involvement of a lawyer does not, however, confer protection upon routine business documents and communications.  Protection or privilege  depends on the nature and purpose of the communication or document.

With these principles in mind, the disputed documents are ruled upon as follows.  (Tab references are to Transport's privilege log and supplemental privilege log.)

---

[18]   This court respectfully disagrees with dicta in *Allendale* questioning whether Illinois courts would apply the common interest extension of attorney-client privilege in such a situation. *See Allendale*, 152 F.R.D. at 140.  The only Illinois authority cited in *Allendale* for that comment is *In re Liquidations of Reserve Ins. Co.*, 524 N.E.2d 538 (Ill. 1988), which addressed whether reinsurance was like primary insurance for purposes of claim prioritization in liquidation proceedings; it did not analyze the common interest doctrine or any other privilege issue.

A conclusion that there is no common interest extension of the privilege between Transport and its reinsurers would leave no ability for Transport to provide its reinsurers with its attorneys' candid evaluations of the merits of disputed issues in the coverage litigation or to make recommendations for settlement or otherwise discuss litigation strategy.  Such a conclusion would be at odds with the Illinois Supreme Court's emphasis in *Waste Management* on the obligation of cooperation an insured owes the insurer who may be required to pay the claim.

This court also agrees with the court in *Minnesota School Boards* that the comment in *Allendale* is distinguishable dicta because the documents at issue in *Allendale* did not rise to a level meriting protection.  *Minn. Sch. Bds.*, 183 F.R.D. at 632 (quoting *Allendale*, 152 F.R.D. at 136-37).

<u>Tabs A, C, G, H; Suppl. Tab 1</u>
       (TIC 104-108, TIC 7545-49, TIC-R 38-45, TIC-R 48- 53, TIC 67-72.)

Four of these documents are the same report from Transport to its reinsurers dated December 18, 2006; one adds a December 26, 2007 update. Mr. LaJoie states that the document was drafted substantially by LBB attorneys at his request, and he finalized it to provide the insurers with an update of the ARTRA Group bankruptcy, related proceedings and settlement discussions. (LaJoie Aff. ¶¶ 4, 8.)[19]

Having reviewed the documents, the court agrees that they are protected by attorney-client privilege, work-product protection and the common interest extension of those to communications with the reinsurers. These documents are not, as the Trust characterizes them, routine claims handling reports. They are descriptions of proceedings in the bankruptcy proceedings and Muralo lawsuit, including evaluation and recommendations. They describe settlement negotiations concerning the ARTRA Group's claim against Transport that evolved into this lawsuit. They reflect counsel's mental impressions and recommendations about settlement and litigation strategy.

By 2006, LBB had been representing Transport in the bankruptcy proceedings for three years, the same proceedings in which the Trust's counsel here was representing the Creditors Committee. The Trust's argument that these documents "were created long before Transport could have anticipated litigation" (Pl.'s Reply at 8), borders on frivolous in light of the history here: the many asbestos claims that preceded and led to ARTRA Group's filing for bankruptcy, and the prolonged bankruptcy proceedings begun with the filing in 2002 that led to this lawsuit.

---

[19]   Work product is not limited to documents prepared by an attorney. It extends to documents prepared in anticipation of litigation "by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A).

The Trust's motion for production of these documents is denied.

Tabs B, F
        (TIC 143-44, TIC-R 23-24)

These are copies of the same document: Transport's claim handler's correspondence to Transport's reinsurers, dated April 16, 2003, described as a supplemental reinsurance notice and enclosing a settlement demand made to Transport from ARTRA's attorneys.  (The material from ARTRA's attorneys is not attached here, but is included in Supplemental Tab 5 as TIC R 25-32.) It is a notice and transmittal, except for the last sentence of the second paragraph, which is work product describing the actions that Transport will take in response to the demand.

These documents must be produced, with the last sentence in the second paragraph redacted (beginning with "We" through "have").

Tab D
        (TIC-R 04-05)

This is a string of email correspondence to and from Mr. LaJoie and his colleagues, discussing the filing of this lawsuit and Transport's proposed response.  It is work product.  The motion to compel is denied as to this document.

Tab E
        (TIC-R 17-20)

This is a letter to Transport dated October 9, 2003 from LBB, then representing Transport in the bankruptcy, discussing that proceeding and the Muralo lawsuit, and reflecting the advice and strategy of counsel.  It is protected by attorney-client privilege, work-product protection and the

common interest extension of those to communications with the reinsurers. The motion to compel is denied as to this document.

Suppl. Tab 2
(TIC 8215-8217; TIC 9034-9043)

The first of these is an email transmitting the second, which is a copy of Transport's internal guidelines for billing and reporting to its reinsurers, and also including a general reference to Transport's reserves, including the ARTRA Group account. The guidelines simply describe a format to be followed; they contain no information specific to the Trust's coverage claim. Because the Trust has agreed that Transport need not produce information regarding its reserves, and these documents contain nothing relevant to any of the claims or defenses raised in this case, Transport need not produce TIC 8215-8217 and TIC 9034-9043.

Suppl. Tab 3
(TIC-R 33; TIC-R 35; TIC-R 37; TIC-R 46-47)

These documents are spreadsheets and lists about Transport's reserves for the ARTRA claim. They contain no textual information about the claim, simply lists of amounts. Because the Trust has agreed that it is not seeking any information about the establishment of the reserve or the amount of the reserve, there is nothing in these documents that requires production.

Suppl. Tab 4
(TIC 145, TIC 146, TIC 147, TIC 152, TIC 4121, TIC-R 02-03, TIC-R 06, TIC-R 36)

TIC 152 and 4121 are two copies of a letter sent by Transport to its reinsurer, and TIC 145, 146 and 147 are notices sent by Transport to its reinsurers, all in 1997 about the fact that there have been numerous claims filed against ARTRA. These are routine claims handling documents. The reference to reserves may be redacted, as well as the last sentence of TIC 152 and 4121 (from "We" to "time") but the balance must be produced.

TIC -R 02-03 and 06-07 are two separate email chains inquiring about the amount of reserve. Since the Trust has agreed not to seek information about the amount of the reserve, these documents need not be produced.

TIC- R 36 is simply a cover letter apparently enclosing the December 2007 update. Although the update is protected for the reasons described above, the cover letter is not. That must be produced. However, the last sentence of the first paragraph, which refers to reserves, may be redacted.

Suppl. Tab 5
(TIC 62; TIC 79; TIC 135; TIC 136; TIC 137; TIC 138; TIC 139; TIC 140; TIC 141; TIC 142; TIC 148-49; TIC 150-51; TIC 6146; TIC-R 01; TIC-R 07; TIC-R 08-09; TIC-R 10; TIC-R 11; TIC-R12; TIC-R 13-15; TIC-R 16; TIC-R 21-22, TIC 125-32.)

For the most part, these documents are simply requests for updated reports and cover letters for the reports. Although the content of reports may be protected (as discussed above), there does not appear to be protectable material in the requests or cover letters. They must be produced.

TIC R-25 is a letter from ARTRA Group's then-counsel dated March 31, 2003 stating a settlement demand and enclosing an spreadsheet apparently prepared by ARTRA Group's consultant, presumably supporting the demand. Transport advances no argument why that document

is protected.  It must be produced.

The Trust's motion is granted with respect to the documents in Supplemental Tab 5.

### Suppl. Tab 6
(TIC 161; TIC 182; TIC 286; TIC 351; TIC 287-292; TIC 352-357; TIC 5144-5150.)

These documents reflect calculation of policy premiums.  The Trust states that it is not interested in premium amounts and numbers in worksheets, but wants any text.  (Pl.'s Suppl. Reply at 8.)  There is no textual material in these documents.  Transport is not required to produce the documents in Supplemental Tab 6.

### Suppl. Tab 7
(TIC-R 54-578)

These documents are Transport's reinsurance contracts.  The Trust has withdrawn its motion with regard to the contracts themselves.  (*See* Pl.'s Supp. Reply at 8.)  Transport is not required to produce the documents in Supplemental Tab 7.

## CONCLUSION

For the foregoing reasons: (1) Defendant Transport Insurance Company's Motion to Compel Plaintiff and Frank/Gecker to Produce Documents [dkt 100] is granted to the extent it is not already moot; (2) Plaintiff ARTRA 524(g) Asbestos Trust's cross-motion for a protective order imbedded in its opposition to Transport's motion [dkt 112] is denied as moot; and (3) Plaintiff ARTRA 524(g) Asbestos Trust's Motion to Compel Production of Reinsurance Documents and Communications [dkt 106] is granted in part and denied in part. The documents ordered produced pursuant to this opinion may be designated "Highly Confidential" pursuant to the Stipulated Protective Order and Addendum to the Stipulated Protective Order previously entered in this case. [Dkt 45, 135.] If any party believes the documents require additional protection beyond that provided by the existing Protective Order and Addendum, that party may move for further protection.

**IT IS SO ORDERED.**

_Geraldine Soat Brown_

GERALDINE SOAT BROWN
United States Magistrate Judge

DATED: September 28, 2011